17-3840 Ricky Jackson v. City of Cleveland et al., 17-3843 Kwame Adjumu v. City of Cleveland, oral argument not or excuse me oral argument as follows 15 minutes for the plaintiffs 15 minutes to be shared by the defendants. Ms. Wang for the plaintiffs' appellate. Morning. Morning. I'd like to reserve four minutes. My name is Elizabeth Wong. I represent Ricky Jackson and I'm presenting argument on behalf of Ricky Jackson, Kwame Adjumu, and Wiley Bridgman spent over 100 years in prison for a murder of which they're innocent. All they are asking for is the opportunity to present to a jury their constitutional claims that Cleveland detectives fabricated and coerced a false statement from a 12-year-old boy. This misconduct happened to them because the City of Cleveland absolutely failed to train its officers and failed to create policies to train officers in their obligation to disclose exculpatory evidence and in fact the city had an express policy telling officers that witness statements were not to be disclosed. Weren't there some other policies though that the city had that could be read to clarify that particular I believe you're probably referring to a policy that allowed for the, you're arguing, allowed for the exclusion of witness statements? Yes, the policy I'm referring to is General Police Order 19-73 which the city's designated witness, designated pursuant to Rule 30b-6, testified that he agreed with our reading of that rule. What that rule expressly stated was that there was certain exculpatory evidence favorable to defendants should be disclosed but in bold capital letters it also said that exempted from that rule was witness statements given to police officers. And so these other rules 14, 66, 77, 78, your position is they don't clarify that rule? Exactly and the city's witness Edward Tomba also agreed that those rules don't shed any light on officers obligation to disclose and preserve exculpatory evidence. In fact the only rule that Mr. Tomba talked about at his deposition was Rule 99 and all that rule said was that officers have to follow the law. He also admitted at his deposition that officers were not trained in what the law was and in fact those rules, the ones cited by the city, they all stem from a 1950 rules manual that was adopted prior to the decision in Brady in 1963. And so there is a genuine dispute of material fact as to what police officers were told at the time, what they were trained at the time, and it's certainly a genuine enough dispute for plaintiffs to be able to present their claims to a jury. Is it that there was a policy of approving withholding exculpatory evidence by police or is it a the lack of a policy forbidding that? We do argue both theories, Your Honor. They're very different though, right? They are different but they actually support each other because the rule, the express policy, the written policy, 1973 says that witness statements taken by police are not to be disclosed. At the same time the city did not adopt any written policies or adopt any practices that informed officers of what Brady was, of their obligation to preserve or disclose exculpatory evidence. The police were precluded from giving to prosecutors written statements? All written statements? Well, it's not just... That just sounds like that can't have been the policy. I just can't imagine that. Do you see the problem I'm having? I mean I can see the way it's written it's sort of like an exception to a requirement that looks a little overbroad because the rule was not that broad but that there would be a policy that police don't give written statements to the prosecutors. What could conceivably be the idea underlying that kind of policy? It didn't say written statements. It said any, it says the foregoing does not authorize the discovery or the inspection of any reports made by the prosecuting attorney or his agents, police departments are his agents, in connection with the investigation or prosecution of the case or of statements made by witnesses. And so the key thing here... So you read that to tell police not to give statements by witnesses to prosecutors in general? Correct. Really? Yes. I don't understand. Why would any policy say that? What would be the conceivable reason for such a policy? I think at the time they considered it work product. Obviously that conflicted... Work product by the policeman that you couldn't give to your own attorney? Yes. Can you explain that? I mean I'm having trouble setting myself back in 1950 but even so that just sounds like that can't possibly... Police don't give information to prosecutors because it's private? I don't know what the rationale was. The total absence of a rationale suggests that maybe it's kind of strange to read it that way. And what about this criminal rule 16? If you read it in conjunction with that, doesn't that clarify what this 173 means? No. Because the general order only... It just reproduces in text what criminal rule 16 said. And what criminal rule 16 said was that disclosure of evidence favorable to defendants should be disclosed but there was this bold print exception for statements made by witnesses. And so the written statement... And so to be clear, exculpatory evidence can include both written statements by witnesses as well as oral statements by witnesses. This is... This court recognized this in Maldwan. It's recognized it in Gregory, Spurlock, a number of other cases. The Supreme Court has recognized it. Other circuits have recognized it. The key exculpatory statement that Eddie Vernon made to the detectives in this case, and including Detective Stoecker, was I did not recognize these people as having been participants in the crime. And the people in the lineup he was referring to were Ricky Jackson and Wiley Bridgman. That was an exculpatory statement, oral statement that he gave to the officers which was not disclosed. I understand. But we're talking about the policy. And I'm still having... But your argument, unless I'm misunderstanding it, would also suggest that if it was an accusatory, culpatory witness statement, they were not supposed to give it to prosecutors. Well, this was an exception... It sounds passing strange, you have to admit. The exception, though, was to the enumerated things that the defense counsel could request from the prosecuting attorney. And so one of the things that the defense attorney could request from the prosecuting attorney was evidence favorable to the defendant. But this was an exception... You're relying on language which you say is different from that, right? Yes. So what I'm saying is that this exception as to witness statements only apply to evidence favorable to the defendants. The way to read the rule, and the way a reasonable jury could read this rule, and in fact the way that the city's designated witness read the rule is exactly how we're reading it. Which is that officers were not required to disclose exculpatory statements given to them by witnesses. And so our mono-claim encompasses not only this express policy, but also the failure to train, as well as the deliberate choice not to have a policy. If any of the evidence on any of those three theories is sufficient for a trial, then plaintiffs are entitled to have a trial on this claim. In terms of the failure to train, this court and the Supreme Court has recognized that you can have single incident liability where there's recurring situations for obvious potential for constitutional violations. This case is indistinguishable, and our evidence on the mono-claim in this case is indistinguishable from Gregory. In Gregory, this court said that cities must train officers in their obligation to disclose exculpatory evidence, and the evidence was exactly the same as we have here. There was expert testimony. We have expert testimony, which this court also recognized in Russo v. City of Cincinnati. Expert testimony can be especially important in a failure to train case in order for the jury to understand the adequacy or inadequacy of training. We also have evidence from the city's own witness, Deputy Chief Tomba, that there was no training on the obligation to disclose or preserve exculpatory evidence between 1950 and 1980. We have Detectives Tell and Turner, who testified that officers were confused about their Brady obligations and that as a routine matter of practice, detectives withheld evidence and made cases for the prosecution. The city relies solely on on-the-job training. And on that topic, what Deputy Chief Tomba testified was that at no time between when Brady was decided and 1980 did the city even inform officers of what their obligations were to disclose exculpatory evidence. If older officers were training younger officers during that time period, they would not have known what their obligations were. At bottom, there is a factual dispute on the failure to train claim because we have differing testimony from Detectives Tell and Turner, as well as the city's own witness, conflicting with other testimony from other detectives. In light of the factual dispute, we have to have a jury resolve that question. I've talked a little bit about the express policy. The third way of showing our claim against the city is that the city chose not to have a policy on the disclosure of exculpatory evidence. This was, again, testimony that its own witness gave that there was no policy. All of the detectives who were around during that time period testified that there was no policy on the disclosure of exculpatory evidence. And as we point out in our briefs, the city had notice of the failures and it recognized as early as 1972 that it needed to adopt policies and procedures that were consistent with the legal requirements of the day. I'm going to turn quickly to the qualified immunity issue. As to that, there is no real dispute from the individuals that it was clearly established as of 1975 that officers have the obligation to preserve and disclose exculpatory evidence. Under Pyle v. Kansas, which was decided in 1942, that case held that police officers who suppress favorable evidence and threaten witnesses into testimony violate the due process rights of a criminal defendant. That was decided in 1942. At bottom, even if the court were to disagree, regardless of how the court decides on the claims against the city and Detective Stoicher, the claims against the states have to be remanded because those claims survive under the court's decision in Krabs v. Scott. Counsel, how have you divided the time? Your Honor, in light of the bulk of her argument related to the Manelle claims, we decided to split it evenly, which will mean seven minutes. I'm speaking on behalf of Detective Stoicher and the estate defendants, and my colleague will take the balance of the time. Very well. May it please the Court, Stephen Funk of Retzel and Andrus, on behalf of appellee Karen Lamondola, who is the guardian ad litem for Frank Stoicher and the estate defendants. Let me begin by emphasizing that this is a very unique case because it does involve a homicide investigation that occurred over 40 years ago. The lead detectives in the case died long before the case was ever filed. In fact, the case is primarily based upon the testimony of Edward Vernon, who voluntarily came to the police in 1975 to identify who the perpetrators of the crime were. And then, 40 years later, after 40 years of silence, he never told anyone that he had never witnessed this crime. 40 years later, after all the homicide detectives are deceased, he came forward to recant his prior sworn testimony. And while he now alleges that two of the detectives, Turpay and Stemple, allegedly threatened him, essentially threatened his parents with perjury if he didn't testify, those two detectives are alive. Detective Turpay died in 2001. Detective Stemple actually died in 1979. And their estates, whatever assets they had, had long been distributed, and they have stipulated that they're not seeking any damages from the estates or their beneficiaries. And briefly, with respect to the estate defendants, I'd like to make two brief points and then move on to the balance of my time to deal with Detective Stoicher. One, Crabs v. Scott, that case is clearly distinguishable. It's an unauthorized search and seizure claim. And this case involves malicious prosecution. And the claims for Brady, fabrication of evidence, all essentially are related to malicious prosecution because malicious prosecution is the state law equivalent of those claims. And the Ohio Supreme Court, and Crabs even recognized that Ohio law is controlling on survivability, the Ohio Supreme Court in State X. Raul Crowe v. Wygant held that malicious prosecution claims do not survive death. And Crabs v. Scott did not address that decision because it did not involve a malicious prosecution claim. But that decision is controlling. Are you the lawyer for the estates? Yes. So the estates hire you? How do they? Well, actually, I've been retained by the city of Cleveland to represent all the individual defendants and the estate defendants. Oh, I see. So that's the key thing is the estate defendants have not waived. Now, Your Honor, they've stipulated that they're not seeking any damages from the estate. All they're wanting to do is to get a claim against the estate so that they can pursue a claim against the city of Cleveland. The problem is that there's no right of identification by the city of Cleveland. There's nothing to indemnify. The estates don't have any assets and don't have any risk of liability given the fact. So you're saying Crabs doesn't apply to all 1983 claims? I'm saying that Crabs does not apply to malicious prosecution claims and claims related to malicious prosecution under Ohio law. In Ohio, malicious prosecution claims do not survive death. The Supreme Court held in Robertson v. Wegman that that does not violate 1983 for malicious prosecution claims to not survive death. And so all we're asking the court is to follow stated X. Rel. Crow v. Wigand, which is controlling Ohio's Supreme Court precedent on that question. And then even if the court were to reverse on survivability, you still have the question of state law compliance. And that ruling that the trial court made only addresses state law issues, but it applies equally to the federal law claims as well. So on that additional ground, we ask the court to affirm the dismissal of the estate defendants. Now, with respect to Detective Stoecker, I want to say that Detective Stoecker, he retired from the Cleveland Police Force in 1978 after 26 years of an unblemished police career. He's now 92 years old. He suffers from severe dementia, and he's unable to respond to the accusations that have been made against him. But I submit that there is insufficient evidence by which a jury could hold Mr. Stoecker liable. Why is the fact – what about the fact that he signed the police report that had all the information in it, including the statement that's being challenged? Why isn't that enough? Well, the trial court did address that question. It goes to the elements of the claims. One, there was no evidence other than the mere signature on the report. One, there was no authentication of the signature. Two, there was no evidence as to what that signature meant. Did that mean that he had personal knowledge of what was in the report? Was he involved in what was in the report? We don't know. That's the problem. There's an absence – all we have is that. There's an absence of evidence that would ultimately lead a fact finder to conclude that that is a knowing fabrication of evidence, which is the standard that has to be met. So what you have here is not a genuine issue of fact. It's an absence of evidence in which you're piling inference upon inference in order to draw an ultimate conclusion of a knowing fabrication of evidence in which there's simply no evidence as to his state of mind – culpable state of mind. Secondly, with respect to the fabrication of evidence, the trial court specifically dealt with that question, saying that there's no evidence in the record that the May 25th report was ever used or relied upon by the prosecutors to obtain an indictment. There's no evidence that Mr. Stryker had any communications whatsoever with the prosecutors who were involved in the grand jury proceedings or the trials. In fact, the evidence showed that Mr. Vernon testified live at both the grand jury and the trials, and there's no accusation by Mr. Vernon that Detective Stryker ever did anything to compel him to testify falsely either at the grand jury or at the trial. There's no evidence of any communications between Stryker and Vernon at all. So the trial court found that – Stryker was Stamper's partner, right? There's evidence that he was Stamper's partner. Stamper, excuse me. And Detective Stamper did have contact with Vernon. That's right. Now, so what we have then is based upon the inference that he was his partner, you have an attempt to make guilt by association, and therefore pile inference upon inference that everything that is being alleged against Stamper is therefore – can be alleged against Stryker. And I would submit that that is insufficient evidence. You have to have specific evidence that Stryker did personally engage in wrongful conduct, and you have to show that Stryker had a culpable state of mind. With respect to the military prosecution claims against Stryker, he did not play any part in the prosecutions. He did not testify at the grand jury. He did not testify at the – there's no evidence that he testified at any trials. There's no evidence he had any communications with any of the prosecutors. And again, this court has time and time held, including in the Saunders v. Jones case, that you have to have proof of actual reliance. There's no evidence that the prosecutors actually relied on that May 25th report in pursuing either getting a grand jury indictment or – and you can't fill in the blanks. That's fundamentally – the fact that there's an absence of evidence against Stryker is a basis for awarding summary judgment. It's not a basis for finding an issue of fact. So at this time, I'll reserve the rest of the time for my colleague. Thank you. May it please the Court, Bill Menzel, our attorney for the Monell-defended city of Cleveland. Regarding the Monell claim, what we have here today is impermissible, responding at superior liability, masquerading as an attempt at an explicit Monell policy, and also a failure to train theory. I'm not going to go into many additional facts other than those the attorney outlined, but I do want to point out three specific facts. Originally, in the complaint and in the summary judgment motion below, plaintiffs were pursuing seven theories of Monell liability. For purposes of the appeal and what we're here for today, we're only left with the Brady claim. Because the other six claims, the six by the Jackson plaintiff and the additional unconstitutional lineup claim by the other two plaintiffs, were either dealt in just merely a perfunctory manner in the appellate brief or not at all. Second, plaintiffs already outlined the three theories of Monell under which she's pursuing, and I'm just highlighting that once again. We're not here for either an implicit policy case, also known as a custom case. Plaintiffs disavowed pursuing that case any further in their reply appellate brief on page 24, footnote 15. Third, the other fact I want to point out is the context in which we're dealing with this Monell claim and the general police order 19-73. This case obviously took place in 1975, approximately 18 months after the state of Ohio first adopted rules of criminal procedure. And that is, at the end of the day, what general police order 19-73 all it states is what is this new rule of criminal procedure and how do we follow the process in the substance. In order for a plaintiff to prevail on their explicit Monell policy claim, you would have to have a policy either from the manual rules from 1950s or in general police order 19-73, stating that police officers, you are instructed not to turn over any evidence, either exculpatory or inculpatory, to the prosecutor. And that is nowhere in writing in any of the policies. So then what we're left with is the interesting attempt by plaintiffs, at least at the summary judgment stage, obviously it's commonplace at the pleading stage to plead alternative theories of fact, but we've got a case here where they're saying on the one hand, city, you have an explicit policy to not turn over any evidence to the prosecutor, either exculpatory evidence to the prosecutor. And on the other hand, you made a conscious decision not to have any policy stating that. And both of those couldn't be farther from the truth. The evidence is clear. What we're dealing with in this case, as everybody knows, the type of evidence we're dealing are witness statements, not from the defendant, but non-party witnesses. And Criminal Rule 16G clearly says what is to be done with those, both witness statements on behalf of the prosecution and witness statements on behalf of the defense. Those are to go to the court in an in-camera inspection for review, and the court will decide how to handle those issues. What if GPO, this 1973, is just simply kind of a negligent way of describing what Criminal Rule 16 says? Could that be enough for a Monell claim? We could debate whether it's a negligent policy. It doesn't say it in the best words, but in order to have a Monell claim, negligence is enough. If we're here quibbling about whether it could be written in a better manner, then there's no Monell claim. So you're saying negligence is enough for a Monell claim? No, negligence is not enough for a Monell claim. A Monell claim, once again, in this case, the explicit policy would have to state, police officers, you were instructed not to turn over evidence to the prosecutors. In this case, both the rules and also the training, all the officers were trained to turn over all the evidence, either exculpatory or inculpatory to the prosecutor, because it's the prosecutor at the end of the day who has to make the determination whether or not the evidence is exculpatory or not. What about the evidence that Ms. Wong pointed out that this 1973 was interpreted, at least by one of the witnesses, as requiring that they not turn over? First of all, we would disagree that former D.C. Tomba did testify to that effect. Second of all, it's for this court to make the legal determination whether or not the policy is explicit enough or meets the legal requirements for a Monell explicit policy claim. If there's evidence, though, that it's being interpreted that way by the police, shouldn't that be enough? It's the way it's being applied within the department. First of all, he did not testify to that. He testified clearly that all officers are trained to turn over all evidence to the prosecution, not just exculpatory evidence, all evidence to the prosecution. That's how the rules state as well. Going back to what the plaintiffs testified about all the witnesses, all the witnesses were clear, including the two former homicide detectives that are still living, Leo Allen and Michael Cummings, who were homicide detectives in the early 70s, and they both testified that they were specifically trained to turn over all evidence to the prosecution. Also, two witnesses that plaintiffs brought in an attempt to bolster their case, former police officers Tell and former police officer Turner, they both testified. Now, we have issues with both of those because neither of those were homicide detectives, so one of our points is that they have no relevant or material evidence on the issue of what was done in the homicide unit. Chief Tell was in the auto theft unit and Officer Turner was in basic patrol and then was the equivalent of the vice unit and then went into community relations. But even Officer Tell, if you give any weight to Officer Tell's testimony, he himself testified that he was trained in the academy to turn over all evidence to the prosecution. I see I have a minute left, so I'm going to move on to the failure to train case, which I basically just addressed all the evidence. This is not a case, like Attorney Funk said, where you've got conflict of evidence, like you did in the Gregory case where there was evidence on both sides. This case, it's undisputed that everybody that was deposed said that they were trained to turn over all evidence to the prosecution. One of the important points that Judge Boyko noted in his opinion is this is an intentional act case. And he noted on page, it was either 12 or 14 of his opinion that what was done or what is alleged to have been done by the four main detectives, Turpey, Farber, Stoecker, and Stample, was done in spite of any rules or training that they were given. This is an intentional conduct, so the rule could have said something to the effect that you police officers, thou shalt deliver all evidence, exculpatory or not, directly to the defense counsel. And the city submits that that would not have occurred in this case. So in closing, the city would ask that the court affirm the summary judgment on both the Minnell claim and also the remaining state law claim against the city, the indemnification, because there is no private right of action under Ohio law for indemnification. Thank you. Thank you, sir. Do you have a rebuttal? In their argument and in their briefs, the defendants focus on the facts. And what they do is ignore the facts that are in the record that support the plaintiffs. I will cite you to Deputy Chief Tombaugh's deposition at R102, pages 1735 to 1736, where he agrees with our reading with General Police Order 19-73. In fact, not only did he agree with it, that it exempted witness statements from disclosure, but he testified that it is not in effect today because today, after Brady, you have to turn over all evidence to the prosecutor. That is a genuine dispute of material fact based on the city's own designated witness brought in to testify about its policies and training. As to the dispute of fact with respect to what happened with Eddie Vernon, the record could not be more clear. Eddie Vernon testified repeatedly that he told Stemple and Stoicher that he did not recognize anyone in the lineup who committed the crime, meaning Ricky Jackson and Wiley Bridgman. Stemple testified at trial that he and Stoicher conducted the lineup. He testified that he brought in Eddie Vernon and Karen Smith to view the lineup. Stoicher signed a report which his guardian ad litem, Karen Lamondola, authenticated his signature on the report. That report, which contained the fabricated statement, was then given to Prosecutor Del Balso. Del Balso testified at his deposition that he relied on all the police reports and everything that was in the file to initiate the charges, which caused the prosecution to be commenced. This court on remand in Sanders v. Jones said that false police reports that set a prosecution in motion, and this is consistent with King v. Harwood, Miller v. Maddox, Mills v. Barnard, all of those cases say that fabricated evidence and false police reports that initiate a prosecution can fit that requirement of the Fourth Amendment claim. All that the defendants have done is dispute the facts presented by the plaintiff. Can I ask a question about indemnity? Yes. What do you do with the Ayers case? Do you say it's wrong or it's not decided by the Supreme Court or it's distinguishable or what? We do disagree with it. Of course it was decided by the 8th District. I believe there's going to be a petition for leave to appeal to the Ohio Supreme Court that will be filed on it. So the final say, the final word by the Ohio Supreme Court has not yet been given. How long will that take? I don't know. Well, I mean, your guess is better than mine. I don't know. We intend to file the petition sometime this week. Oh, you're the lawyer in that case too? Not me, but the firm, my firm. Your firm is the lawyer in that case as well, I see. Yes. Assume it goes against you and that would be our assumption until it gets reversed. How does that affect it? Why doesn't that suggest that rather than say the case isn't right, say it isn't properly brought by these plaintiffs? Well. Or does it? I mean, you can be candid, I guess. I mean, this court does have to defer. The law is the law. This court has to defer to the Ohio court's interpretation of Ohio law and that was a case of first impression and the 8th District opinion is the only opinion out there. We still think that that law is wrong. So we should hold it just in case it gets changed? Well, you should say that it's not right in this case because there's been no judgment. I understand how it's not right if under the law as we presently find the Ohio courts to interpret it, these people can't bring suit. That's not an unripe case. That's a case that you lose, right? I mean, I guess you can petition for rehearing or do whatever happens when the law of Ohio changes. You see what I'm saying? Unripeness is when certain facts happen, then we'll be able to figure out what the answer is, not let's hold it until the law changes. Or is there some other way in which it's unripe? It's unripe because there hasn't been a judgment yet. And I agree it's an uphill climb for us on that claim. But I will say, and this is to respond to Mr. Funk, the question of indemnification and what happens and whether we can collect after we get a judgment, if we get a judgment from a jury, is not before this court. And so the only question on the survival issue with respect to the estates is whether or not the Section 1983 claims survive the deaths of Turpe, Farmer, and Stemple. And they clearly do under Krauss v. Scott. And so that is the only question. He says you've agreed that you're not going to collect from those people other than through indemnity. Correct. And if you can't collect through indemnity, then I guess your ability to collect along that route depends on having the lawyer for the estate sue, right? Well, there's the possibility of assignment. That seems unlikely since it's the same lawyer. The city is paying for them, so that raises a conflict issue as well. But that question is not before this court. Thank you. Thank you, counsel. The case will be submitted.